UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ROBERT ALFANO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CV-08-252-B-W |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## AMENDED[1] ORDER ON RECOMMENDED DECISION

Following a plot from the television series, CSI, Robert and Abigail Alfano attempted to perpetrate a scheme involving counterfeit checks. What so confounded the CSI actors, however, did not deter the United States Secret Service, and both the Alfanos were found out, prosecuted, convicted, and sentenced for bank fraud. Mr. Alfano now complains that his guideline sentence range was inaccurately calculated and blames his attorney for failing to catch and raise the issues leading to the inaccuracy. Because the Court finds that but for his counsel's failure to object to application of the sentencing enhancement under United States Sentencing Guideline § 2B1.1(b)(10)(C)(i) it would have assigned Robert Alfano a different sentence from that imposed, the Court grants Mr. Alfano's motion for appointment of counsel and orders a hearing to determine if the conduct of counsel in failing to raise objection to application of the sentencing enhancement to Mr. Alfano was objectively unreasonable under *Strickland*, and whether a rehearing on sentencing is required.

---

[1] This Amended Order corrects a clerical error contained in the Order on Recommended Decision (Docket # 14) dated December 12, 2008. The correction appears on page 10 of the Order in the second sentence of the last paragraph. The words "seven-level enhancement" should be "five-level enhancement".

# I.     BACKGROUND

## A.     The Criminal Conduct

On November 9, 2005, Robert Alfano and his then wife, Abigail Alfano, were indicted on one count of bank fraud under 18 U.S.C. § 1344. *Indictment*, *United States v. Alfano*, No. 05-cr-91-JAW (Docket # 1). The prosecution version of Mr. Alfano's offense alleged that on August 25, 2003 a person identifying himself as Steven Chapman cashed a check at a Shop 'n Save in Pittsfield, Maine. *Prosecution Version* at 1, *Alfano*, No. 05-cr-91-JAW (Docket # 78). The check purported to be drawn on an account at Bank of New York in the name of Atlantic Coast Contractors (ACC). *Id.* The person claiming to be "Mr. Chapman" presented a state of Maine ID and the manager of the store authorized the transaction. *Id.* After "Mr. Chapman" left the store, the cashier told the manager that he looked like an "Alfano" from Palmyra, Maine. *Id.* The check was subsequently returned by Shop 'n Save's bank as counterfeit, the police were notified, and it was discovered that Maine had no record of a Steven Chapman. *Id.*

Between September 4 and September 8, 2003, Ms. Alfano deposited four checks drawn on the same ACC account at Bank of New York as the check presented by "Mr. Chapman." *Id.* at 1-2. On September 9, 2003, a person identifying himself as David Taylor entered a Shaw's Supermarket in Saco, Maine, and cashed a check drawn on the ACC account at the Bank of New York and made payable to David R. Taylor. *Id.* at 2. As with the Shop 'n Save check, this check was returned as counterfeit. *Id.*

In reality, the six checks were not issued by ACC and did not include the actual company account. *Id.* Bank of New York records confirmed that the account number was valid, but that it was assigned to Toys "R" Us, where Mr. Alfano was an employee. *Id.*

After police unraveled the charade, the Alfanos conceded that they had gotten their idea from the popular television drama CSI. *Id.* at 3. In total, the loss from the six checks amounted to approximately $3,000. *Id.* On October 17, 2006, Mr. Alfano entered a guilty plea. *Minute Entry*, *Alfano*, No. 05-cr-91-JAW (Docket # 79).

### B.      March 27, 2007 Sentencing Hearing

On March 27, 2007, Mr. Alfano appeared for sentencing on his single count of bank fraud in violation of 18 U.S.C. § 1344. In preparation, the United States Probation Office prepared a Presentence Investigation Report (PSR). *Revised Presentence Investigation Report Dated 3/1/07* (*PSR*). The PSR assigned Mr. Alfano a base offense level of seven under United States Sentencing Guideline (U.S.S.G.) § 2B1.1(a)(1), and identified a single specific offense characteristic, stating that "[p]ursuant to U.S.S.G. § 2B1.1(b)(10)(C)(i), there is an increase to [offense] level 12 since means were used to obtain and use false identification."[2] *Id.* ¶¶ 12, 14. After adjusting for acceptance of responsibility, the total offense level was ten. *Id.* ¶ 22. Mr. Alfano's record of criminal conduct placed him within criminal history category VI. *Id.* ¶ 33. Based on a total offense level of ten and a criminal history category of VI, the guideline range for imprisonment was calculated as twenty-four to thirty months. *Id.* ¶ 42.

Although Mr. Alfano raised a number of objections to the PSR, he did not object to the offense level enhancement under U.S.S.G. § 2B1.1(b)(10)(C)(i). *Id.* at 14. The Government raised no objections to the PSR. *Id.* At the sentencing hearing, Mr. Alfano confirmed that he had read the PSR, reviewed it with his court-appointed counsel, Wayne R. Foote, understood its contents, and, other than an issue disregarded by the Court in

---

[2] The 2006 edition of the Guidelines Manual was used for the purpose of sentencing Mr. Alfano and unless otherwise indicated citation to the guidelines in this opinion are to that year.

sentencing, believed it to be accurate and correct.  *Tr. of Proceedings* at 4:4-12, 5:17-19, *Alfano*, No. 05-cr-91-JAW (Docket # 110) (*Sentencing Tr.*).  The Government recommended a sentence in the middle of the guideline range.  *Id.* at 9:15-17.  Mr. Alfano's counsel noted that without the U.S.S.G. § 2B1.1(b)(10)(C)(i) enhancement, the guideline range would be nine to fifteen months, and urged that a reasonable sentence would be at "the the lower end of the [guideline] range or even below that."  *Id.* at 15:13-17, 24-25; 16:1-8.

Prior to making its guideline calculations, the Court noted that there were no disputed matters.  *Id.* at 21:13-14.  It applied the five-level increase under U.S.S.G. § 2B1.1(b)(10)(C)(i), and calculated the applicable guideline range for imprisonment as twenty-four to thirty months.  *Id.* at 21:17-19, 24-25.  Taking into account the fact that Mr. Alfano was already serving a state sentence, the Court imposed a sentence of twenty-four months, the bottom of the guideline range; the federal sentence, however, was wholly consecutive to the state sentence.[3]  *Id.* at 28:12-17; *Judgment*, *Alfano*, No. 05-cr-91-JAW (Docket # 96).  The Court also imposed supervised release of five years, a fine, restitution, and a mandatory special assessment.  *Id.*

### C.   The Sentencing Enhancement and the Appeals to the First Circuit

On April 18, 2007, Mr. Alfano appealed to Court of Appeals for the First Circuit. *Notice of Appeal*, *Alfano*, No. 05-cr-91-JAW (Docket # 98).  Mr. Alfano raised a single issue that was not raised at the sentencing hearing:  "whether the district court plainly erred in concluding that, in committing bank fraud, defendant 'used a [] means of identification unlawfully to produce or obtain any other means of identification' within the meaning of U.S.S.G. § 2B1.1(b)(10)(C)(i), and therefore increasing his offense level and resulting

---

[3] According to the PSR, a state court had sentenced Mr. Alfano on October 10, 2006 to a two-year jail term for failure to appear after bailed and for forgery.  *PSR* ¶¶ 26-27.

guideline sentence range." *United States v. Alfano*, No. 07-1624, 2008 WL 867387, at *1 (1st Cir. April 2, 2008).

### 1.    United States Sentencing Guideline § 2B1.1(b)(10)(C)(i)

The United States Sentencing Commission Guideline for violation of 18 U.S.C. § 1344 is found in U.S.S.G. § 2B1.1.    Under U.S.S.G. § 2B1.1(a)(1), if the offense of conviction has a statutory maximum term of imprisonment of twenty years or more the base offense level is seven.   U.S.S.G. § 2B1.1(a)(1).   This level is enhanced under U.S.S.G. § 2B1.1(b)(10) "if the offense involved . . . (C)(i) the unauthorized transfer or use of any means of identification unlawfully to produce or obtain any other means of identification . . . ." U.S.S.G. § 2B1.1(b)(10).   When applicable, the enhancement raises the offense level to a minimum of twelve.  *Id.*

The commentary to U.S.S.G. § 2B1.1(b)(10) defines "means of identification":

'Means of identification' has the meaning given that term in 18 U.S.C. § 1028(d)(7) except that such means of identification shall be of an actual (*i.e.*, not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct).

U.S.S.G. § 2B1.1(b)(10) cmt. n.9(A) (emphasis in original).   Under 18 U.S.C. § 1028(d)(7), means of identification is defined as

any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any--
    (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
    (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
    (C) unique electronic identification number, address, or routing code; or
    (D) telecommunication identifying information or access device (as defined in section 1029(e) [18 USCS § 1029(e)]);

18 U.S.C. § 1028(d)(7).

## 2.    The Initial First Circuit Appeal

In his opening appellate brief, Mr. Alfano made a "three-pronged attack on the enhancement," however, "[o]nly the first prong [was] developed in any depth." *Alfano*, No. 07-1624, 2008 WL 867387, at *1. This first prong argued that because Mr. Alfano used the name of a fictitious person, Steven Chapman, to cash a check that was the subject of the indictment, U.S.S.G. § 2B1.1(b)(10)(C)(i) did not apply. *Id.* at *1-*2. The First Circuit opined:

> It is true that the phrase 'means of identification' as used in section 2B1.1(b)(10)(C)(i) includes only means of identification of 'an actual (i.e., not fictitious) individual.' However, the means used here included not only the fictitious name of one of the payees, but also the account number of Toys R Us and the payor name of Atlantic Coast Contractors, both actual entities.

*Id.* at *2 (footnotes and citation omitted). The First Circuit footnoted that it did not consider an argument raised by Mr. Alfano for the first time in his reply brief: that Toys "R" Us and ACC were not "individuals." *Id.* at *1 n.5.

Mr. Alfano's second prong contended that U.S.S.G. § 2B1.1(b)(10)(C)(i) did not apply because that provision requires that the means of identification must be "other than the defendant" himself. *Id.* at *2. The First Circuit did not disagree, but noted that this requirement was satisfied because the means of identification used by Mr. Alfano, Toys "R" Us and ACC, was other than himself. Mr. Alfano's final prong, which the First Circuit acknowledged might have been a close call if it had been "preserved and further developed," was his argument that U.S.S.G. § 2B1.1(b)(10)(C)(i) "requires that two means of identification be used, one to create the other, and that, here, the second means is absent." *Id.* Noting that it had never considered the question, and finding other courts in conflict, the First Circuit refused to find plain error. *Id.*

Because Mr. Alfano failed to raise his arguments at sentencing, the First Circuit applied a plain error standard to all three prongs, and affirmed his sentence. *Id.*; *Judgment No. 07-1624*, *Alfano*, No. 05-cr-91-JAW (Docket # 114).

### 3.    The First Circuit Rehearing

Undeterred, Mr. Alfano moved for rehearing or rehearing *en banc*. The First Circuit granted the motion for rehearing. Upon rehearing, Mr. Alfano pressed the issue that the First Circuit panel had earlier dispatched by footnote: that Toys "R" Us and ACC were not "individuals" and therefore U.S.S.G. § 2B1.1(b)(10)(C)(i) did not apply. He argued that the panel should not have deemed the argument waived because its inclusion in his reply brief was due to an argument raised for the first time in the Government's brief and eventually accepted by the panel, that "individuals" included business entities such as Toys "R" Us and ACC. Again, the First Circuit did not find plain error. It did, however, delete and replace its prior footnote:

> In his reply brief, defendant argues, for the first time, that those entities were not 'individuals' within the meaning of application note 9(A) or 18 U.S.C. § 1028(d)(7). Assuming that this new argument was merely forfeited, rather than waived for failure to raise it sooner, it does not survive plain-error scrutiny. What constitutes an 'individual' for that purpose has never been decided in this circuit, neither party cites a case squarely on point in any other circuit, and we have been unable to find one. Therefore, like the other arguments discussed in the text, this fails plain-error scrutiny as well.

*Order*, *Alfano*, No. 07-1624 (*May 24, 2008 Order*). Mr. Alfano again moved for rehearing, but this time was denied. *Order*, *Alfano*, No. 07-1624 (*July 8, 2008 Order*).

### D.    The Pending 18 U.S.C. § 2255 Motion

Without success at the appellate level, on July 23, 2008 Mr. Alfano filed the pending 18 U.S.C. § 2255 motion with this Court. *Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside,*

*or Correct Sentence by a Person in Federal Custody* (Docket # 1) (*Pet.'s § 2255 Mot.*).[4]  The

Government responded on September 25, 2008.  *Gov't Resp. to Mot. to Vacate, Set Aside, or*

*Correct Sentence Pursuant to 28 U.S.C. § 2255* (Docket # 6) (*Gov't Resp.*).  On October 3,

2008, Mr. Alfano filed an emergency motion to stay execution of sentence.   Pro Se

*Emergency Mot. to Stay Execution of Sentence* (Docket # 9) (*Emergency Mot.*).   The

Government responded on the same day.  *Gov't Resp. to Mot. to Stay Execution of Sentence*

(Docket # 10) (*Gov't Resp. to Stay*).  The Magistrate Judge filed her recommended decision

on October 7, 2008.  *Report and Recommended Decision* (Docket # 11) (*Rec. Dec.*).  Mr.

Alfano objected on October 20, 2008.  *Pet.'s* Pro Se *Obj. to Recommended Decision on 28*

*U.S.C. § 2255 Mot.* (Docket # 13).

## II.    DISCUSSION

Mr. Alfano's § 2255 petition raises a single ground for relief:   "U.S.S.G. §

2B1.1(b)(10)(C)(i) was erroneously applied and trial counsel was ineffective in not objecting

to its application."  *Pet's § 2255 Mot.* at 5.  Abandoning the second and third prongs brought

before the First Circuit panel, Mr. Alfano fixes his energy on the first prong as it evolved at

the appellate level.   Reconstituted as an ineffectiveness of counsel claim, Mr. Alfano now

asserts that, but for his counsel's objectively unreasonable failure to argue that U.S.S.G. §

2B1.1(b)(10)(C)(i) did not apply because business entities are not "individuals," he would

have received a lighter sentence of imprisonment.

---

[4] On the same date, Mr. Alfano moved for appointed counsel.  *Mot. to Appoint Counsel* (Docket # 3).
Magistrate Judge Kravchuk denied the motion, but noted that she would reconsider the ruling if appointing
counsel would "serve the interests of justice."  *Order* (Docket # 4).  Later, Mr. Alfano filed a renewed motion to
appoint counsel.  *Renewed* Pro Se *Mot. for the Appointment of Counsel Under the Criminal Justice Act* (Docket
# 7).  Magistrate Judge Kravchuk denied the renewed motion, *Order denying Mot. to Appoint Counsel and
denying Mot. to Stay* (Docket # 12), but advised in her recommended decision that counsel be appointed if the
Court granted the motion to vacate.  *Report and Recommended Decision* at 9 (Docket # 11).

### A.      The 18 U.S.C. § 2255 Motion

Recently in *United States v. De La Cruz*, the First Circuit recited the standard for analyzing a Sixth Amendment ineffective assistance of counsel claim stemming from federal prosecution:

> 'The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect.' *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).  In order to prevail, a defendant must show both that counsel's representation fell below an objective standard of reasonableness and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).  In other words, a defendant must demonstrate both seriously-deficient performance on the part of his counsel and prejudice resulting therefrom.

514 F.3d 121, 140 (1st Cir. 2008).  The First Circuit noted that the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), endorsed a flexible approach:

> Although the Supreme Court in *Strickland* discussed the performance prong of an ineffectiveness claim before the prejudice prong, the Court made clear that 'there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.' *Id.* at 697. As the Court noted: 'If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' *Id.*

*Id.*

### 1.      The Prejudice Prong

Mr. Alfano argues that the initial basis for his enhancement was erroneous because application note 9(A) to U.S.S.G. § 2B1.1 makes it clear that the means of identification must be of an actual, and not a fictitious, person. *Prelim. Mem. in Support of Mot. Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody* at 10-13 (Docket # 1-2) (*Pet.'s § 2255 Mem.*).  He contends that both parties involved in the

sentencing proceedings operated under the mistaken assumption that his use of the Steven Chapman ID was sufficient to qualify him for the enhancement, *Id.* at 13, and notes that the Government abandoned this theory at the First Circuit, instead defending the enhancement on the grounds that the checks named two actual business entities. *Id.* Mr. Alfano argues that this alternate basis is also insufficient because business entities are not "individuals" within the meaning of that term as it is used in application note 9(A). *Id.* at 13-16.

> As instructed by the First Circuit,
>
> We are mindful that, in evaluating the prejudice suffered by a defendant as a result of his counsel's alleged deficient performance, we must consider the 'totality of the evidence before the judge or jury.' *Id.* A verdict 'only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.' *Id.* at 696; *see also Buehl v. Vaughn*, 166 F.3d 163, 172 (3d Cir. 1999) (noting that '[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the *Strickland* prejudice prong has been satisfied'); *Reed v. Norris*, 195 F.3d 1004, 1006 (8th Cir. 1999) (finding it impossible for the defendant to establish prejudice where the evidence of his guilt was overwhelming); *Bieghler v. McBride*, 389 F.3d 701, 707 (7th Cir. 2004) (finding no prejudice where overwhelming evidence pointed to the defendant's guilt).

*De La Cruz*, 514 F.3d at 140-41. Additionally, "when, as in this case, a petition for federal habeas relief is presented to the judge who presided at the petitioner's [criminal proceedings], the judge is at liberty to employ the knowledge gleaned during previous proceedings and make findings based thereon without convening an additional hearing." *United States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993).

Mr. Alfano's guideline sentence would have been less than twenty-four months had the five-level enhancement of U.S.S.G. § 2B1.1(b)(10) not been applied. Absent the enhancement, his offense level was seven. Applying the two-level reduction for acceptance of responsibility, his adjusted offense level would have been five. For a total offense level of

five and a criminal history category of VI, the guideline range for imprisonment is nine to fifteen months.

### a.   A Different Guideline Range

The question turns to whether this Court would have applied the U.S.S.G. § 2B1.1(b)(10)(C)(i) enhancement if Mr. Alfano had raised the same objections at sentencing he now raises in his § 2255 motion.  For her part, after evaluating the arguments before the Court, the Magistrate Judge concluded that "[h]ad counsel argued against the applicability of the enhancement on the theory that Steven Chapman was a fictitious individual, there is little doubt that he would have met with success."  *Rec. Dec.* at 8.  The Court agrees.  The language of application note 9(A) is sufficiently explicit to compel the conclusion that the enhancement could not apply based simply on the use of a fictional individual.[5]

### b.   The Actual Entity Issue

The next question is whether the Government would have nevertheless defended the enhancement on the theory raised before the First Circuit that Toys "R" Us and ACC, both actual entities, qualified as "means of identification" under the U.S.S.G. § 2B1.1(b)(10)(C)(i), or, alternatively, whether the Court would have identified this theory *sua sponte*.  Because the Government raised this argument at its first opportunity after Mr. Alfano raised his objection to U.S.S.G. § 2B1.1(b)(10)(C)(i) on appeal, the Court is satisfied that the question would have been presented at sentencing had Mr. Alfano then objected to the enhancement.

---

[5] At sentencing, the Court would not have had the benefit of the First Circuit's later analysis of U.S.S.G. § 2B1.1(b)(10(C)(i), and would not have known that the Government jettisoned a contrary argument on appeal. Nevertheless, the First Circuit's observations and the Government's appellate concession by omission are consistent with the Court's conclusion here.

### c.      The Definition of "Individual"

The final question is whether the Court would have found that Toys "R" Us and ACC, both actual entities, qualified as individuals under application note 9(A) to U.S.S.G. § 2B1.1(b)(10).  If so, his sentence would have been the same; if not, his sentence would have been more lenient.

The Court would have been without clear precedent.  On May 24, 2008, upon Mr. Alfano's motion for rehearing, the First Circuit noted that

> [w]hat constitutes an 'individual' for that purpose has never been decided in this circuit, neither party cites a case squarely on point in any other circuit, and we have been unable to find one. Therefore, like the other arguments discussed in the text, this fails plain-error scrutiny as well.

*May 24, 2008 Order*.  Four months later, on October 7, 2008, the Magistrate Judge observed that since the First Circuit order "there has not been any addition to the federal case law on the question of whether the guideline applies to a purely business entity."  *Rec. Dec.* at 6. The Court has not found a case decided subsequent to October 7, 2008 that addresses the issue.  Although Mr. Alfano devotes several pages to support his position that a business entity, such as Toys "R" Us or ACC, is not an "individual," *Pet.'s § 2255 Mem.* at 13-16, in its response, the Government does not discuss the *Strickland* prejudice prong at all, and did not object to the Magistrate Judge's recommended decision.

The Court turns to the language of the guidelines.  *United States v. Dixon*, 449 F.3d 194, 202 (1st Cir. 2006) ("A court charged with the interpretation of a sentencing guideline should look first to the plain language of the guideline and, unless the Sentencing Commission has clearly indicated an intention to give a certain term a special or guideline-specific meaning, should apply that language as written, assigning commonly used words their ordinary meaning.").  Subsection 2B1.1(b)(10) does not use the term, "individual," and

although the application note to that subsection uses the term, it does not define it.  U.S.S.G. § 2B1.1(b)(10); *id.* cmt. n.9(A).  Similarly, the general application note to U.S.S.G. § 2B1.1 fails to define "individual."  *Id.* cmt. n.1.  Despite this, definitions provided for other terms hint at a meaning for "individual" which excludes businesses.  Application note 1 to U.S.S.G. § 2B1.1 defines "victim" and "person":

> 'Victim' means (A) *any person* who sustained any part of the actual loss determined under subsection (b)(1); or (B) *any individual* who sustained bodily injury as a result of the offense.
>
> 'Person' *includes individuals*, corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

*Id.* (emphasis added).  By listing each separately, the definition for 'person' contemplates a difference between individuals and a variety of business entities.  Such a difference is borne out by the definition for 'victim,' which distinguishes between "actual loss" under (A), sustainable by humans and non-humans alike (i.e., any person), and 'bodily injury' under (B), sustainable only by individuals (i.e., not any person).

This intimation is strengthened in application note 9(C).  *Id.* cmt. n.9(C).  That note provides two examples of "conduct to which subsection (b)(10)(C)(i) applies":

> (I)   A defendant obtains an individual's name and social security number from a source (<u>e.g.</u>, from a piece of mail taken from the individual's mailbox) and obtains a bank loan in that individual's name. . . .
>
> (II)  A defendant obtains an individual's name and address from a source (<u>e.g.</u>, from a driver's license in a stolen wallet) and applies for, obtains, and subsequently uses a credit card in that individual's name. . . .

*Id.*  In both examples the use of "individual" clearly suggests that the term applies to human rather than business entities.

Other sections of the guidelines support this interpretation.  For example, in U.S.S.G. § 8A1.1, "'organization" is defined to exclude an "individual": "'Organization' means 'a person other than an individual.'"  U.S.S.G. § 8A1.1.  In adopting this definition, the guidelines follow the statutory definition.  18 U.S.C. § 18 (stating that the term "organization" means "a person other than an individual").  Further, this view is consistent with ordinary usage of the term gleaned from external sources.  *See* Webster's Third New Int'l Dictionary (2002 ed.) (defining "individual" as "a single human being as contrasted with a social group or institution"); *see also Clinton v. City of New York*, 524 U.S. 417, 454 (1998) (discussing a distinction between persons and individuals) (Scalia, J. in part concurring and in part dissenting).

Nevertheless, the guidelines do not conclusively resolve the issue.  Application note 9(A) merely states:

> 'Means of identification' has the meaning given that term in 18 U.S.C. § 1028(d)(7), except that such means of identification shall be of an actual (i.e., not fictitious) individual, other than the defendant or a person for whose conduct the defendant is accountable under § 1B1.3 (Relevant Conduct).

*Id.* cmt. n.9.  By providing that "means of identification" shall have the meaning "given that term in 18 U.S.C. § 1028(d)(7), the commentary incorporates the statutory definition:

> (7) the term 'means of identification' means any name of number that may be used, alone or in conjunction with any other information, to identify a specific individual, including any - -
> > (A) name, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number;
> > (B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique physical representation;
> > (C) unique electronic identification number, address, or routing code; or
> > (D) telecommunication identifying information or access device (as defined in section 1029(e).

18 U.S.C. § 1028(7).  Like application note 9(A), § 1028(7) uses the term "individual" without defining it, and its definitions of "means of identification" focus almost exclusively on personal, not corporate identification.   18 U.S.C. § 1028(7)(A)-(B).   Nevertheless, subsection (C), which generally describes "unique electronic identification number, address, or routing code," could apply to a business, and subsection (D), which incorporates the definition in § 1029(e) of "telecommunication identifying information or access device," could apply to businesses as well as to human beings.  18 U.S.C. § 1028(7)(C)-(D).(citing 18 U.S.C. § 1029(e)).

The Court turns to the history of the adoption of U.S.S.G. § 2B1.1(b)(10) to determine whether it sheds light on its meaning and the Commission's intentions.  The Sentencing Commission adopted U.S.S.G. § 2B1.1(b)(10) and its commentary on November 1, 2000 in response to the congressional enactment of the Identity Theft and Assumption Deterrence Act of 1998 (ITADA).  U.S. Sentencing Guidelines Manual, app. c, am. 596 (effective Nov. 1, 2000) (citing Identity Theft and Assumption Deterrence Act of 1998, Pub. L. 105-318).  The Commission observed that Congress had directed it to "'review and amend the Federal sentencing guidelines and the policy statements of the Commission' to provide appropriate punishment for identity theft offenses under 18 U.S.C. § 1028." *Id.*  The Commission noted:

> The ITADA directed the Commission to assess certain specific factors in its consideration of appropriate penalties for identity theft, including:  the number of victims, the harm to a victim's reputation and inconvenience caused by the offense; the number of means of identification, identification documents, or false identification documents involved in the offense; the range of offense conduct; and, the adequacy of the value of loss to an individual victim as a measure for establishing penalties.

*Id.*  The Commission explained its decision to enhance the penalty for more sophisticated identity theft, specifically account takeovers that breed another level of indentification means.  *Id.*  Significantly, the Commission described the potential victims as both individuals and institutions:  "Such sophisticated conduct makes detection by *both the individual and institutional victims* much more difficult."  *Id.* (emphasis supplied).  The Commission later observed that in enacting the ITADA, Congress was "particularly concerned" about "individual victims," but noted that more sophisticated conduct can also cause "substantial disruption of record-keeping by governmental agencies and private financial institutions upon which the stream of commerce depends."  *Id.*

The Sentencing Commission explanations can be variously interpreted.  First, they confirm that from its perspective, identity fraud can result in both human and institutional victims.  At the same time, its distinction between "individual" and "institutional" victims suggests that "individual" refers to humans, not business entities.

In any event, it is clear that responding to the congressional directive in the ITADA, the Commission amended U.S.S.G. § 2B1.1 with a view toward enhancing the penalties specifically for those who commit the crime of identity theft.  ITADA § 4 (stating that "[p]ursuant to its authority . . . the United States Sentencing Commission shall review and amend the Federal sentencing guidelines and the policy statements of the Commission, as appropriate, to provide an appropriate penalty for each offense under section 1028 of title 18, United States Code, as amended by this Act").  Moreover, among the victims of that crime, Congress was most concerned about the impact of identity theft on individuals.  This congressional concern drove the adoption of the new guideline provision and explains why

the commentary regarding the application of subsection (b)(10) was directed to individuals, not businesses.

However, U.S.S.G. § 2B1.1 covers more than just identity theft.  It captures a number of "basic economic crimes," including larceny, forgery, and bank fraud.  Because U.S.S.G. § 2B1.1(b)(10) and its commentary were written as a response to ITADA, its provisions, when read in relation to bank fraud, have an awkward fit.  Bank fraud by definition involves a scheme to "defraud a financial institution," and it is not out of the ordinary for the fraud, as in this case, to involve forged business checks.  18 U.S.C. § 1344(1).  But, U.S.S.G. § 2B1.1(b)(10) and its commentary do not contemplate the use of a false means of identification that does not involve a human being.

This does not make much sense.  It would seem that when they are the victims of crime, the law would seek to treat harm to individuals and corporations in approximately the same fashion, and the statutory penalty for bank fraud is more severe than the penalty for non-aggravated identity theft.  *Compare* 18 U.S.C. § 1028(b) (establishing a statutory maximum prison term for some identity thefts of fifteen years), *with* 18 U.S.C. § 1344 (establishing a statutory maximum prison term for bank fraud of thirty years); *but see Clinton*, 524 U.S. at 454 (stating that "Congress treats individuals more favorably than corporations and other associations *all the time*") (emphasis in original).  Further, the criminal use of a false means of business identification places the good name of a business at risk and carries separate, but potentially harmful consequences to the business.

Despite the Court's disquiet about whether the Sentencing Commission truly intended U.S.S.G. § 2B1.1(b)(10) to apply only to human beings and to exclude business victims of economic crime from its operation, the Court is obligated to apply the guideline language as

it is written and, when that language is ambiguous, to interpret it "in favor of the defendants subject to [it]." *United States v. Santos*, __U.S.__, 128 S. Ct. 2020, 2025 (2008). To read "business" into the term "individual" would be contrary to the plain meaning of the term and the Court, therefore, agrees with Mr. Alfano that if the question had been raised at his sentencing, the Court likely would have concluded that U.S.S.G. § 2B1.1(b)(10)'s five-level enhancement would not have applied to him.

## 2.    The Performance Prong

Nonetheless, to prevail on his § 2255 motion, Mr. Alfano must clear another hurdle. He must establish that his counsel's conduct in failing to object to application of U.S.S.G. § 2B1.1(b)(10) "fell below an objective standard of reasonableness." *De La Cruz*, 514 F.3d at 140-41.

"To prove deficient performance, a defendant must establish that counsel was not acting within the broad norms of professional competence." *Owens v. United States*, 483 F.3d 48, 57 (1st Cir. 2007). In assessing the quality of counsel's representation, the Court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and internal quotation marks omitted).

Mr. Alfano contends that Mr. Foote did not raise objection to the sentencing enhancement because the argument did not occur to him, and to him this oversight alone constitutes a prima facie case of unreasonableness. The Government hypothesizes that Mr. Foote's failure to object could have been intentional: "Arguably, competent counsel could

conclude that his client's interests were better served by avoiding a challenge that might or might not succeed and arguing instead for leniency for the client." *Gov't Resp.* at 2.

Of course, the person best able to explain Mr. Foote's strategic decisionmaking is Mr. Foote.  The Government represented that it exchanged telephone calls with Mr. Foote on September 24 and 25, 2008 in an effort to understand why no challenge to the adjustment was made, but Mr. Foote "took the position that the attorney-client privilege prevented him from answering Government counsel's questions about his handling of Alfano's sentencing." *Id.* at 3.

A criminal defendant who challenges the adequacy of his attorney's performance generally cannot invoke the attorney-client privilege to bar his attorney from disclosing information that relates to his claim.  *See Tasby v. United States*, 504 F.2d 332, 336 (8th Cir. 1974) ("A client has a privilege to keep his conversations with his attorney confidential, but that privilege is waived when a client attacks his attorney's competence in giving legal advice, puts in issue that advice and ascribes a course of action to his attorney that raises the specter of ineffectiveness or incompetence. . . .  When a client calls into public question the competence of his attorney, the privilege is waived."); *Vial v. United States*, 1998 U.S. Dist. LEXIS 9722, at *4 n.4 (D.R.I. April 14, 1998); *see also Laughner v. United States*, 373 F.2d 326, 327 n.1 (5th Cir. 1967) (stating that "[t]he rule that a client waives his privilege by attacking the attorney's performance of his duties seems to have been adopted unanimously by those courts which have dealt with the question").

The Court cannot assess at this stage whether Mr. Foote's failure to object to the enhancement was intentional.  If he simply overlooked the argument, it is likely that his failure crossed the line into the objectively unreasonable, particularly because application

19

note 9(A) provides that the enhancement cannot be applied, as it was at sentencing, on the basis of a fictitious individual. *See Cofske v. United States*, 290 F.3d 437, 443 (1st Cir. 2002) (noting that "courts tend to be somewhat less forgiving where counsel altogether overlooks a possible objection or opportunity"). If the decision was strategic, the Court cannot evaluate its reasonableness without knowing it.

The Court agrees with the Magistrate Judge that "it is hard to imagine that defense counsel would have been concerned that arguing that the guideline was inapplicable because of the express directive of the application guideline would have endangered Alfano's prospects for acceptable of responsibility." *Rec. Dec.* at 8 n.3. Nevertheless, rather than decide the matter on the basis of the hypothetical, given the highly deferential standard applied to review of counsel's conduct, an evidentiary hearing to develop the actual explanation seems more prudent. *See* Rule 8, Rules Governing Section 2255 Proceedings (allowing the district judge to determine whether an evidentiary hearing is warranted); *see also Cofske*, 290 F.3d at 444 (noting that "[i]f anything turned on counsel's precise thought process, we would remand for an evidentiary hearing"); *United States v. Butt*, 731 F.2d 75, 78 (1st Cir. 1984) ("An evidentiary hearing is required if the records and files in the case, or an expanded record, cannot conclusively resolve substantial issues of material fact, and when the allegations made, if true, would require relief." (internal quotation omitted)).

**B.     The Motion to Appoint Counsel**

Mr. Alfano previously filed and was granted a motion to proceed *in forma pauperis*. *Application to Proceed without Prepayment of Fees and Aff.* (Docket # 2); *Order* (Docket # 4). Having reviewed that motion, the Court is satisfied that Mr. Alfano qualifies for court-appointed counsel under to 18 U.S.C. § 3006A(a)(2)(B). Accordingly, pursuant to Rule 8(c)

of the Rules Governing Section 2255 Proceedings, the Court will appoint Mr. Alfano an attorney. *See* Rule 8(c), Rules Governing Section 2255 Proceedings ("If an evidentiary hearing is warranted, the judge must appoint an attorney to represent a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A.").

### C.      The Emergency Motion to Stay

On October 3, 2008, Mr. Alfano filed an emergency motion to stay execution of sentence. *Emergency Mot.* The Government opposed the motion on the same day. *Gov't Resp. to Stay.* At his sentencing, Mr. Alfano was sentenced to imprisonment for twenty-four months. In his emergency motion, Mr. Alfano represents that he began serving that sentence on April 16, 2008. *Emergency Mot.* at 2. If Mr. Alfano succeeds on his underlying § 2255 motion, his sentencing range is nine to fifteen months. At this point, he has served almost eight months of his sentence. Even assuming the court has the authority to stay the execution of Mr. Alfano's sentence, he has failed to make an adequate showing that such extraordinary relief is appropriate at this juncture. *Compare United States v. Prows*, 448 F.3d 1223, 1226-27 (10th Cir. 2006) (concluding that "the 1984 Sentencing Reform Act repealed the prior statutory authority to stay sentences"), *with United States v. Claiborne*, 790 F.2d 1355, 1356 (9th Cir. 1986) (stating that "[a] stay of execution of sentence after appeals are exhausted is reserved for extraordinary cases").

## III.   CONCLUSION

The Court concludes that, prior to ruling on Plaintiff's pending 18 U.S.C. § 2255 motion (Docket # 1), an evidentiary hearing is warranted to determine whether Mr. Alfano's counsel performed below the *Strickland* standard in failing to object to application of U.S.S.G. § 2B1.1(b)(10)(C)(i) at Mr. Alfano's sentencing hearing. The hearing shall be

conducted "as soon as practicable after giving the attorneys adequate time to investigate and prepare." Rule 8(c), Rules Governing Section 2255 Proceedings.

1. It is therefore ORDERED that the Recommended Decision of the Magistrate Judge (Docket # 11) is hereby AFFIRMED IN PART and REJECTED IN PART.

2. It is further ORDERED that the Order denying Motion to Appoint Counsel and denying Motion to Stay (Docket # 12) is VACATED IN PART to the extent that Plaintiff's Renewed *Pro Se* Motion for the Appointment of Counsel (Docket # 7) is GRANTED, and AFFIRMED IN PART to the extent that Plaintiff's *Pro Se* Emergency Motion to Stay Execution of Sentence (Docket # 9) is DENIED.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 15th day of January, 2009